**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JAVELL FOX,

                              Plaintiff,              No. 9:15-CV-0390
                                                      (TJM/CFH)
            v.

SUPERINTENDENT LEE, et al.,

                              Defendants.

_____


**APPEARANCES:**                        **OF COUNSEL:**

Javell Fox
12-B-1626
Attica Correctional Facility
Box 149
Attica, New York 14011
Plaintiff pro se

Hon. Eric T. Schneiderman            MARIA E. LISI-MURRAY, ESQ.
Attorney General for the             ADRIENNE J. KERWIN, ESQ.
    State of New York                Assistant Attorneys General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

                 **REPORT-RECOMMENDATION AND ORDER**[1]

        Plaintiff pro se Javell Fox ("plaintiff"), an inmate who was, at all relevant times, in the

_____

        [1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

custody of the New York Department of Corrections and Community Supervision ("DOCCS"),

brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Superintendent

("Supt.") Lee, DOCCS Commissioner ("Comm.") Anthony Annucci, Correction Deputy

Superintendent of Administration ("Deputy Superintendent") Wendland, Correction Deputy

Superintendent Security ("DSS") Russo, Deputy Calao, Captain ("Capt.") Webbe, Lieutenant

("Lieut.") Madison, Lieut. Simmons, Lieut. Sullivan, Sergeant ("Sgt.") Bey, Sgt. Connor, Sgt.

Vanacore, Sgt. Barg, Corrections Officer ("C.O.") Kozak, C.O. Waugh, C.O. Miller, C.O. Henry,

C.O. Williamson, C.O. S. Cruz, Corrections Steward C. Jennings, and Corrections Steward

Diane Labatte – who at all relevant times, were employed at Eastern Correctional Facility

("Eastern") – violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth

Amendments.  Dkt. No. 76 ("Am. Compl.").  Presently pending before the Court are plaintiff's

Motion for Summary Judgment[2] pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.")

56 and defendants' Cross-Motion to Dismiss pursuant to Fed. R. Civ. P. 12(c).  Dkt. Nos. 111,

118.[3]

On July 27, 2017, defendants opposed plaintiff's motion on the grounds that (1) it was

premature, as discovery had not yet concluded; and (2) plaintiff's motion failed to comply with

N.D.N.Y. Local Rules 7.1(a)(1), (a)(3). Dkt. No. 112.[4]  Out of "extreme solicitude" to plaintiff pro

---

[2] Plaintiff does not move for summary judgment on his Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims.

[3] Plaintiff's Motions for Contempt, Dkt. Nos. 117, 129, 130, 131, 138, will be addressed in a subsequent decision.  Plaintiff's Motion for Preliminary Injunction, Dkt. No. 128, is currently before the assigned District Judge for review.

[4] In their original memorandum of law in opposition, defendants argued that plaintiff failed to comply with N.D.N.Y. Local Rule 7.1(a)(1), (3) by filing a motion exceeding the twenty-five page limit and failing to

se, the Court "accepted for filing plaintiff's enlarged Memorandum of Law . . . that contains his statement of material facts within," and directed defendants to file a supplemental response. Dkt. No. 113. On August 9, 2017, plaintiff filed a reply. Dkt. No. 116. On August 18, 2017, defendants filed a supplemental response in opposition to plaintiff's Motion for Summary Judgment, and cross-moved for dismissal pursuant to Fed. R. Civ. P. 12(c). Dkt. No. 118. Plaintiff filed a reply to defendants' cross-motion. Dkt. No. 123. For the following reasons, it is recommended that plaintiff's Motion for Summary Judgment be denied, and defendants' Cross-Motion to Dismiss be denied.

## I. Arguments

### A. Plaintiff's Motion for Summary Judgment

In support of his Motion for Summary Judgment, plaintiff filed a Statement of Material Facts.[5] On review of plaintiff's Motion for Summary Judgment, the facts will be related herein

---

file a separate Statement of Material Facts with specific record citations. Dkt. No. 112 at 7-8. Defendants have re-alleged their argument as to the Material Statement of Facts in their Memorandum of Law in Opposition and Cross-Motion to Dismiss pursuant to Fed. R. Civ. P. 12(c), and it will be discussed infra. See Dkt. No. 118-3 ("Def.'s Mem. of Law") at 3.

[5] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material

in the light most favorable to defendants as the nonmoving parties.  See Rattner v. Netburn, 930

F.2d 204, 209 (2d Cir. 1991) ("In assessing the record . . . to determine whether there is a

genuine issue as to any material fact, the court is required to resolve all ambiguities and draw

all factual inferences in favor of the party against whom summary judgment is sought.").

### 1. Free Exercise of Religion and Freedom of Expression

On or about November 7, 2014, Lieut. Madison directed plaintiff to cut his hair because

it was "shaved on the sides and dreadlocked in a Mohawk style."  Dkt. No. 111-1 ("Pl.'s Mem.

of Law") ¶ 1.  Plaintiff refused, citing his right to freedom of expression and free exercise of

religion.  Id.  On November 9, 2014, Lieut. Madison directed non-party C.O. Skred to issue

plaintiff a misbehavior report charging him with refusing a direct order (106.11). Id. ¶¶ 2, 3. On

or about November 11, 2014, Lieut. Simmons conducted a disciplinary hearing and found

plaintiff not guilty, "acknowledg[ing] that the charge was unconstitutional and that plaintiff had a

right to exercise his religion and a freedom of expression, equal protection of the law[,] and

religious rights under the Religious Land Use and Institutionalized Persons Act of 2000."  Id. ¶

4.

---

Facts. The non-movant's response shall mirror the movant's Statement of
Material Facts by admitting and/or denying each of the movant's
assertions in matching numbered paragraphs. Each denial shall set forth a
specific citation to the record where the factual issue arises. The
non-movant's response may also set forth any additional material facts
that the non-movant contends are in dispute. Any facts set forth in the
Statement of Material Facts shall be deemed admitted unless specifically
controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

4

On November 29, 2013, Lieut. Madison complained to C.O. Cruz about Lieut. Simmons'
not guilty disposition at the November 2014 disciplinary hearing. Pl.'s Mem. of Law ¶ 5. C.O.
Cruz informed Lieut. Madison that the next time he saw plaintiff, he would write him another
misbehavior report because of his hairstyle. Id. On December 7, 2014, C.O. Cruz "abandoned
his post" supervising inmates "on the other side of the jail" and directed C.O. Williamson and
C.O. Waugh to frisk plaintiff. Id. ¶¶ 6, 7, 8. C.O. Williamson "pat frisked and strip frisked"
plaintiff by forcing him "to remove his religious headgear and shake his hair out." Id. ¶ 11. After
the frisk, C.O. Williamson and C.O. Waugh instructed plaintiff to return to his cell. Id. ¶ 12. Five
minutes later, C.O. Williamson arrived to search plaintiff's cell. Id. ¶ 13. C.O. Williamson
informed plaintiff that his cell was being searched because of plaintiff's hairstyle. Id. C.O.
Waugh issued plaintiff a misbehavior report for "altered pants" and refusing to cut his hair. Id.
¶ 14. Lieut. Simmons commenced a disciplinary hearing[6] as to the December 7, 2014
misbehavior report and found plaintiff guilty of altered pants and not guilty of refusing a direct
order. Id. ¶ 16. As to plaintiff's not guilty disposition, Lieut. Simmons stated that "plaintiff ha[d]
a constitutional right to wear a Mohawk hairstyle and said hairstyle posed no threat to the safety,
security[,] and order of the facility." Id. Plaintiff informed Lieut. Simmons on the record that he
had been retaliated against for a "favorable hearing," and that Lieut. Simmons was not
supposed to find him guilty of altered pants. Id. Lieut. Simmons sentenced plaintiff to thirty days
keeplock,[7] and thirty days loss of commissary, recreation, packages and phone privileges. Id.

_____

[6] Plaintiff does not specify the tier of the disciplinary hearing.

[7] "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and
depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995);

¶ 17.

As part of a grievance investigation,[8] Supt. Lee assigned Capt. Webbe to investigate plaintiff's claims of harassment by C.O. Waugh, C.O. Williamson, C.O. Cruz, and Lieut. Madison.  Pl.'s Mem. of Law ¶ 20.  Capt. Webbe "covered up" C.O. Waugh, C.O. Williamson, C.O. Cruz, and Lieut. Madison's conduct.  Id. ¶ 21.  Capt. Webbe affirmed that there was no official misconduct, and that Sgt. Connor gave the officers permission to frisk plaintiff and search his cell.  Id. ¶ 22.  As part of a grievance investigation,[9] Supt. Lee assigned DSS Russo to investigate Capt. Webbe's "covering up official misconduct."  Id. ¶ 24.  DSS Russo "covered up" any misconduct of lower-level officers.  Id.  Supt. Lee also "covered up" the misconduct of his subordinates.  Id. ¶ 27.   On January 30, 2015, C.O. Kozak issued plaintiff a "frivolous misbehavior report" in retaliation for plaintiff's grievance against C.O. Cruz.  Id. ¶ 56.

Lieut. Madison ordered plaintiff to remove his "religious headgear," and directed Sgt. Vanacore to issue plaintiff a misbehavior report for his hairstyle.  Pl.'s Mem. of Law ¶ 68.  On March 6, 2015, C.O. Cruz and C.O. Miller also wrote plaintiff a misbehavior report for his hairstyle.  Id. ¶¶ 69, 147. Both misbehavior reports charged plaintiff with untidy person (118.30), and refusing a direct order (106.11).  Id. ¶ 70.  On or about May 2, 2015, Lieut. Madison approached plaintiff's cell and remarked that he "can't believe plaintiff still got [sic] that stupid haircut."  Pl.'s Mem. of Law ¶ 120.  Lieut. Madison directed non-party Lieut. Geminez to write

---

N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

[8] Plaintiff does not identify the grievance associated with this investigation.

[9] Plaintiff also does not identify the grievance underlying this investigation.

plaintiff a misbehavior report. Id. Eventually, plaintiff suffered a "mild heart attack" due to the "stress [of] retaliation." Id. ¶ 118.

On or about June 1, 2015, non-party C.O. Calotti issued plaintiff a misbehavior report for "having magazines and books." Pl.'s Mem. of Law ¶ 144. One of these magazines was a religious magazine. Id. ¶ 145. On or about June 12, 2015, Lieut. Simmons sentenced plaintiff to thirty days keeplock. Id. When plaintiff explained that he had a constitutional right to have books, magazines, and religious reading material, Lieut. Simmons told him to "take it up with the court [because] he don't [sic] care." Id. ¶ 146. On or about June 16, 2015, Dep. Russo denied plaintiff permission to attend Ramadan services, fast, and "brotherhood with fellow prisoners as plaintiff is registered N.O.I." Id. ¶ 125.

On or about July 18, 2015, plaintiff was released from keeplock. Pl.'s Mem. of Law ¶ 130. During a pat frisk,[10] Sgt. Bey questioned plaintiff about the instant lawsuit. Id. ¶ 133. On or about August 2, 2015, Sgt. Barg and non-party C.O. Krantz planted marijuana on plaintiff. Id. ¶ 134. Sgt. Barg placed plaintiff in protective custody so that he would be unable to access his property to prepare for the disciplinary hearing.[11] Id. ¶ 135. After the hearing,[12] Sgt. Barg released plaintiff from protective custody. Id. ¶ 138. Sgt. Barg informed plaintiff that "he planted the marijuana and had Officer Krantz make the report and that he got the marijuana from the locker." Id. ¶ 139. Plaintiff received fifty days keeplock stemming from this incident. Id. ¶ 141.

---

[10] Plaintiff does not indicate when the pat frisk occurred.

[11] Plaintiff does not specify the disciplinary hearing to which he is referring or the tier of the hearing.

[12] Plaintiff does not indicate the tier of the hearing.

On a date plaintiff does not specify, Lieut. Madison harassed plaintiff about his religious headgear and forced him to remove it. Pl.'s Mem. of Law ¶ 142. Lieut. Madison called plaintiff an "idiot" for wearing the religious headgear. Id.

### 2. Conditions of Confinement

While plaintiff was in keeplock, C.O. Henry, Sgt. Vanacore, and non-party C.O. Cotton refused to unlock plaintiff's cell door so that he could receive his meals. Pl.'s Mem. of Law ¶ 28. Because there were no food slots at ground level, plaintiff had to climb to the top of the cell bars and "slide his open food tray . . . through the top of the ceiling" to retrieve his meals each day. Id. ¶¶ 28, 32. To fit through the slot, plaintiff had to remove the lid on his food tray, often resulting in paint chips falling from the ceiling into his food. Id. ¶ 32. C.O. Henry harassed plaintiff, calling him a "monkey" as he climbed to retrieve his food. Id. ¶ 28. On December 23, 2014, plaintiff fell while climbing to retrieve his meal. Id. ¶ 33. Plaintiff was hospitalized for three days with a "damaged [ ] lower back," and walked with a cane for six weeks. Id. ¶ 34. Plaintiff was released to a cell that did not require him to "use the steps,"[13] but was soon transferred back to his old cell conditions. Id. ¶¶ 35, 37. Eventually, plaintiff was transferred to a cell with a ground-level "feed up slot." Id. ¶ 41.

While keeplocked, plaintiff was subjected to "nearly two weeks" of extreme cold weather,

---

[13] Although unclear, it appears that plaintiff is indicating that he was required to climb up the stairs, rather than climb his cell's bars, to retrieve his food from a slot near the ceiling of his cell.

as "civilians" repaired holes in the windows. Pl.'s Mem. of Law ¶ 42.[14]  Corrections officers did not provide plaintiff with additional blankets or clothing, and the heat was off.  Id. ¶ 42. Corrections officers denied plaintiff cleaning products to clean the feces, urine, and spit stains in his cell's toilet and sink.  Id. ¶ 44.  Capt. Webbe directed Sgt. Bey to "threaten plaintiff to cut his hair or receive a Tier III misbehavior report."  Pl.'s Mem. of Law ¶ 74.  Sgt. Bey subsequently issued plaintiff a Tier III misbehavior report.  Id. ¶ 77.[15]

### 3. Sexual Harassment

On January 26, 2015, plaintiff was transferred to Eastern's west wing.  Pl.'s Mem. of Law ¶ 47.  The next day, C.O. Cruz escorted plaintiff to a mental health counseling session.  Id. ¶¶ 50, 51. On the return escort, C.O. Cruz brought plaintiff to a secluded area and "sexually frisked" him.  Id. ¶ 51.  C.O. Cruz "began to go up plaintiff's testicle and penis as he searched plaintiff's body, he pulled plaintiff's legs in a way to seem as if he was being kinky and a dominatrix."  Id. ¶ 52.  On February 12, 2015, while escorting plaintiff to his disciplinary hearing, C.O. Cruz conducted a pat frisk, in which he "pulled the back of plaintiff's pants down[,] [caressed] plaintiff's thighs, [ ] grinded his penis against plaintiff's buttocks, groped plaintiff's penis and testicles, and then stated, 'I forgot your pussy hurts.'"  Id. ¶ 58.  At an unspecified date, while Supt. Lee made his rounds, plaintiff requested a transfer from C.O. Cruz's housing unit; Supt. Lee refused the transfer request.  Id. ¶ 63.  C.O. Cruz's "perverted" behavior continued, and, on various

---

[14] Plaintiff does not provide a date as to when these alleged violations occurred.

[15] Plaintiff does not specify the subject matter of the Tier III misbehavior report.

occasions, he opened plaintiff's cell door while plaintiff was naked, which would allow other inmates to observe plaintiff naked. Id. ¶ 62.[16]   At an unspecified date, C.O. Cruz instructed plaintiff to "get the fuck on the wall." Pl.'s Mem. of Law ¶ 105.  Plaintiff complied, and C.O. Cruz "pull[ed] plaintiff's pants up into the crack of [his] buttock[s], kick[ed] plaintiff's feet, rub[bed] his hands up plaintiff's penis[,] and then banged plaintiff's head on the wall." Id. ¶ 106.  That same day, C.O. Cruz ordered plaintiff to return to his cell, and denied plaintiff recreation.  Id. ¶ 107. C.O. Cruz told plaintiff that he "can't wait" until plaintiff was transferred to another jail so that "he could get plaintiff stabbed the fuck up." Id. ¶ 108.

## 4. Due Process

Lieut. Simmons conducted a hearing[17] and informed plaintiff that "his supervisors told him to find [plaintiff] guilty."  Id. ¶ 72.   Deputy Superintendent Wendland conducted a Tier III hearing[18] as to Sgt. Bey's misbehavior report, and incorrectly stated that plaintiff's hair was "braided and in locks."  Id. ¶ 79.  At Deputy Superintendent Wendland's hearing, plaintiff produced a prison counselor as a witness, who testified that plaintiff wore his hair in "locks." Id. Plaintiff informed Deputy Superintendent Wendland that his hairstyle was "a part of his religious

---

[16] Plaintiff's facts section contains two paragraphs (¶) labeled with 62.  See Pl.'s Mem. of Law at 23, 24.  The information cited here is taken from the ¶ 62 on page 24 of plaintiff's memorandum of law.

[17] It is unclear from plaintiff's submission to which disciplinary hearing he is referring, or if the undated and March 6, 2015 misbehavior reports were consolidated into one hearing.

[18] Plaintiff does not state when this hearing was held.

practice." Id. ¶ 77.[19]  Deputy Superintendent Wendland found plaintiff guilty for refusing to cut his hair "after . . . [Sgt. Bey] told her that Captain Webbe sent him to threaten [plaintiff]." Id. ¶ 82. Sgt. Vanacore issued plaintiff a misbehavior report for refusing a direct order to cut his hair. Pl.'s Mem. of Law ¶ 109-10.  Lieut. Simmons conducted a Tier II disciplinary hearing, and found plaintiff guilty "because his supervisors told him to[ ]." Id. ¶¶ 110-11.[20]

On or about April 27, 2015, plaintiff received a misbehavior report for refusing a direct order and violation of grooming standards. Pl.'s Mem. of Law ¶ 124.  Lieut. Sullivan conducted a disciplinary hearing,[21] and stated that "he knows it's nothing wrong with [plaintiff's] hair, but [he] should cut it because Lt. Madison don't [sic] like it." Id.  Lieut. Sullivan sentenced plaintiff to thirty days in keeplock, in addition to the five months he already served.  Id.

On or about May 15, 2015, Capt. Webbe conducted a disciplinary hearing,[22] and stated that "Supt. Lee sent him to hold the hearing so that he could skim[23] plaintiff real good."  Pl.'s Mem. of Law ¶ 121.  Capt. Webbe found plaintiff guilty, and sentenced him to four months keeplock and four months loss of phone, commissary, packages, and property. Id. ¶ 122. Capt. Webbe ordered plaintiff to surrender his Koran, religious paperwork and newspapers, and books and magazines.  Id. ¶ 123.

---

[19]  Plaintiff's facts section contains two paragraphs (¶) labeled 77.  See Pl.'s Mem. of Law at 24, 25.  The information cited here is taken from the ¶ 77 on page 25.

[20] Plaintiff does not specify the subject matter of this hearing.

[21] Plaintiff does not specify the tier of the disciplinary hearing nor does he state when this hearing was held.

[22] Plaintiff does not specify the tier of the disciplinary hearing.

[23] Plaintiff defines "skim" as ensuring that he received maximum time.  Pl.'s Mem. of Law ¶ 121.

On June 18, 2015, plaintiff was scheduled to be released from keeplock, but Lieut. Simmons changed his release date to July 18, 2015. Pl.'s Mem. of Law ¶ 128. Due to continued extensions for reasons plaintiff does not specify, plaintiff spent an additional seventy-two days in keeplock past his release date. Id. ¶ 129.

### 5. Access to the Courts

Ms. Labatte and Mr. Jennings, both "corrections stewards," refused to give plaintiff "copies," despite plaintiff's indigent status. Pl.'s Mem. of Law ¶ 97. Plaintiff requested copies "for months to do [an] Article 78 for misbehavior reports plaintiff received, and because of the denial, plaintiff has missed the [four] month deadline." Id. ¶ 98. Deputy Calao, Mr. Jennings, and Ms. Labatte continued to deny plaintiff "copies," and because of those denials, plaintiff "lost a non-frivelous [sic] claim." Id. ¶ 143.

### 6. Defendants' Response in Opposition

In opposition, defendants argue that (1) plaintiff failed to provide a complete and accurate statement of material facts pursuant to N.D.N.Y. Local Rule 7.1(a)(3); and         (2) plaintiff's submissions fail to establish his entitlement to summary judgment. Dkt. No. 118-3 ("Def.'s Mem. of Law") at 3-4. Defendants deny the majority of plaintiff's allegations, admitting only that (1) plaintiff filed a grievance on December 10, 2014; (2) Capt. Webbe found no official misconduct following an investigation regarding a frisk and search of plaintiff's cell; (3) plaintiff filed a complaint requesting to be removed from Eastern's west wing following harassment from C.O.

12

Cruz; (4) on March 6, 2015, C.O. Cruz issued plaintiff a misbehavior report; (5) plaintiff received a misbehavior report for possession of property in an unauthorized area, contraband, and providing false statements/information; and        (6) C.O. Miller co-signed a misbehavior report against plaintiff. Dkt. No. 118-1 at 3, 4, 5, 6, 10. Defendants allege plaintiff injured his back by falling off of a chair and slipping on ice. Id. at 4. Defendants further contend that the temperature in west wing was not ten degrees, as plaintiff alleges, but rather "estimated to be 67-71 degrees." Id. Defendants argue that plaintiff was not moved to the west wing out of retaliation, as he suggests; rather, plaintiff was "in keeplock status pending a disciplinary hearing for altering the waistband of all his pants such that contraband could be hidden." Id. at 5.

In reply, plaintiff argues that (1) this Court "excused" his failure to comply with Local Rule 7.1(a)(3); and (2) he establishes his entitlement of summary judgment on all of his claims. Dkt. No. 123-2 at 3-4. Plaintiff also contends that defendants' cross-motion to dismiss should be denied because they failed to "properly refute" plaintiff's motion for summary judgment. Id. at 13-14.

### B. Defendants' Cross-Motion to Dismiss

Defendants cross-move for dismissal pursuant to Fed. R. Civ. P. 12(b)(c), arguing that (1) plaintiff failed to "allege facts sufficient to state a claim, much less prove one"; and        (2) plaintiff failed to exhaust his administrative remedies. Def.'s Mem. of Law at 19-20.  In opposition, plaintiff argues that defendants' cross-motion should be denied because        (1)

defendants failed to "properly refute plaintiff's motion for summary judgment"; (2) plaintiff alleges facts sufficient to state a claim; and (3) plaintiff exhausted his administrative remedies, and in the alternative, administrative remedies were unavailable.  Dkt. No. 123-3 at 13-14.

## II. Legal Standards

### A. Summary Judgment Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A non-moving party must support such

assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## B. Motion to Dismiss under Fed. R. Civ. P. 12(c)

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Cleveland v. Caplaw, 448 F.3d 518, 521 (2d Cir. 2006) (citing Karedes v. Ackerley Grp., Inc., 423 F.3d 107, 113 (2d Cir. 2005)). The Court is required to "accept[ ] as true the complaint's factual allegations and draw[ ] all inferences in the plaintiff's favor." Id. However, this "tenet . . . is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action,

15

supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

To defeat a motion to dismiss or a motion for judgment on the pleadings, a claim must include "facial plausibility . . . that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (citations omitted).

Still, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Twombly, 550 U.S. at 555 (citations omitted). Although a complaint attacked under the standard set forth in Rule 12(b)(6) does not require detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (citations omitted).

16

### C. N.D.N.Y Local Rule 7.1(a)(3)

N.D.N.Y. Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts. <u>See</u> N.D.N.Y. L.R. 7.1(a)(3). "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." <u>Id.</u> The opposing party is required to file a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs." <u>Id.</u> "Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." <u>Id.</u> (emphasis omitted).

A court is not required to "perform an independent review of the record to find proof of a factual dispute." <u>Amnesty Am. v. Town of W. Hartford</u>, 288 F.3d 467, 470 (2d Cir.2002). The Local Rules are not "empty formalities," and courts within this District have routinely denied a party's motion for summary judgment based on their failure to file a Statement of Material Facts. <u>See</u> <u>Jackson v. Broome Cty. Corr. Facility</u>, 194 F.R.D. 436, 437 (N.D.N.Y. 2000) (denying the defendant's motion for summary judgment for failure to comply with the Local Rules); <u>Monroe v. Critelli</u>, No. 9:05-CV-1590 (FJS/GHL), 2008 WL 508748, at *2-3 (N.D.N.Y. Feb. 21, 2008) (same); <u>Kele v. Middaugh</u>, No. 9:04-CV-0377 (TJM/GHL), 2006 WL 1313348, at *2 (N.D.N.Y. May 12, 2006) (same); <u>see also</u> <u>Lore v. City of Syracuse</u>, No. 5:00-CV-1833, 2007 WL 655628, at *1 (N.D.N.Y. Feb. 26, 2007) (internal quotation marks and citation omitted) ("The Local Rules are not empty formalities[,] . . . serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in

an organized way — thus facilitating its judgment of the necessity for a trial.  Each of these functions is critical.  A party's failure to comply with these rules is fundamentally unfair to the opposing party.").

## III. Discussion[24]

### A. Procedural Issues

#### 1. Statement of Material Facts

Plaintiff failed to submit a Statement of Material Facts in conjunction with his Motion for Summary Judgment; instead, his memorandum of law contains a "Facts" section with numbered paragraphs. Pl.'s Mem. of Law at 4-39. In opposition, defendants argued, in part, that plaintiff's failure to provide a Statement of Material Facts pursuant to Local Rule 7.1(a)(3), and that his motion should be denied on that ground.  Dkt. No. 112 at 7.  On August 1, 2017, the undersigned issued a Text Order stating that, "[o]ut of extreme solicitude to plaintiff's pro se status, the Court accepts for filing plaintiff's enlarged . . . Memorandum of Law for filing that contains his statement of material facts within."  Dkt. No. 113.  Defendants now renew this argument, contending that plaintiff's "factual statement is insufficient and improper and therefore, defendants cannot properly respond as required by the Local Rules." Def.'s Mem. of Law at 3. In deference to plaintiff's pro se status, the undersigned does not recommend dismissal of plaintiff's motion on this ground. See Bulter v. Hyde, No. 9:08-CV-0299 (LEK/GHL), 2009 WL

---

[24] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

3164753, at *3 (N.D.N.Y. Sept. 29, 2009) (declining to recommend dismissal of the <u>pro</u> <u>se</u> plaintiff's Motion for Summary Judgment due to the plaintiff's failure to file an "accurate and complete" Statement of Material Facts).  Therefore, the undersigned will review the summary judgment record, and inconsistent and unsupported facts contained in plaintiff's facts section will <u>not</u> be accepted as true.  <u>See</u>, <u>e.g.</u>, <u>McKnight v. Dormitory Auth. of State of N.Y.</u>, 189 F.R.D. 225, 227 (N.D.N.Y. 1999) ("Thus, the Court deems the portions of [d]efendants 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted.").

Insofar as plaintiff argues that defendants failed to properly refute his facts section, the undersigned concludes that defendants' response "mirror[s] the movant's [facts] by admitting and/or denying each of the movant's assertions in matching numbered paragraphs."  N.D.N.Y. L.R. 7.1(a)(3); Dkt. No. 118-1.  For each denial, defendants set forth a specific citation to the record.  <u>See</u> Dkt. No. 118-1. Therefore, the undersigned determines that defendants properly refuted plaintiff's facts section.

## 2. Prematurity of Summary Judgment Motion

In their July 27, 2017 submission, defendants argue that plaintiff's Motion for Summary Judgment is premature because defendants have not completed discovery.   Dkt. No. 112 at 5.  Plaintiff contends that the motion is not premature because in the "2015 order[,] the Court directed defendants to take plaintiff[']s depositions and defendants willfully failed to."  Dkt. No. 123-2 at 3 n.1.

Generally, "a party may file a motion for summary judgment at any time until 30 days after

the close of all discovery." F ED. R. C IV. P. 56(b).  However, "[t]he nonmoving party should not

be 'railroaded' into his offer of proof in opposition to summary judgment."  Trebor Sportswear

Co., Inc. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989) (citing Celotex Corp., 477

U.S. at 326).  "Under Rule 56(f), summary judgment 'may be inappropriate where the party

opposing it shows . . . that he cannot at the time present facts essential to justify his opposition."

Id. (citing F ED. R. C IV. P. 56(e) advisory committee's note to 1963 amendment).  Nevertheless,

a "trial court may properly deny further discovery if the nonmoving party has had a fully adequate

opportunity for discovery."  Id. (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253,

290-99 (1968)).

Plaintiff commenced this action on April 2, 2015.  Dkt. No. 1 ("Compl.").  The Mandatory

Pretrial Discovery and Scheduling Order directed that all discovery be completed before April

5, 2016.  Dkt. No. 33 at 4.  On February 2, 2016, plaintiff filed a motion to amend his complaint

and submitted his mandatory disclosures.  Dkt. Nos. 42, 43.  On April 1, 2016, plaintiff filed a

second motion to amend his complaint.  Dkt. No. 55.  On July 27, 2016, the undersigned issued

a Text Order denying plaintiff's February 2, 2016 leave to file a motion to amend, and

acknowledging that his April 1, 2016 motion to amend would be reviewed by the Court.  Dkt. No.

65.  On May 19, 2016, defendants filed a letter motion requesting an extension of the April 5,

2016 discovery deadline "to depose the plaintiff after a decision is rendered on the plaintiff's

motion to amend his complaint."  Dkt. No. 60.  On June 2, 2016, the undersigned issued a Text

Order resetting the discovery deadline to June 30, 2016, and staying defendants' motion to

extend the discovery deadline until the undersigned decided plaintiff's motion to amend.  Dkt.

20

No. 61.  On December 19, 2016, the undersigned granted plaintiff's April 1, 2016 motion to amend his complaint.  Dkt. No. 75.  The undersigned set new answer deadlines, and new defendants were served.  Text Min. Entry dated Dec. 19, 2016.  On June 14, 2017, plaintiff filed a motion to supplement his complaint.  Dkt. No. 105.  On June 19, 2017, the undersigned issued a Text Order directing that all discovery be completed by October 2, 2017.  Dkt. No. 106.  On June 29, 2017, plaintiff advised the Court that he would not be submitting a second amendment to his complaint.  Dkt. No. 109.  On July 17, plaintiff moved for summary judgment.  Dkt. No. 111.

Defendants argue that due to (1) the June 2, 2016 stay of discovery; (2) the December 19, 2016 grant of plaintiff's motion to amend; and (3) plaintiff's indication that he wanted to further supplement his complaint, they did not have ample opportunity to depose plaintiff.  Dkt. No. 112-1 ¶¶ 39-41.  In light of the fact that plaintiff's case has been pending for over two years, in the interest of judicial efficiency, the undersigned declines to recommended dismissal of plaintiff's Motion for Summary Judgment on the basis that it is premature.  Defendants are not prejudiced by such conclusion as the undersigned recommends plaintiff's Motion for Summary Judgment be denied.  See Young v. Benjamin Dev. Inc., 395 F. App'x 721, 723 (2d Cir. 2010) (summary order) ("Even if Young had been granted the discovery he sought, it would not have changed the outcome of this matter."); Davidson v. Talbot, No. 9:01-CV-0473, 2005 WL 928620, at *16 (N.D.N.Y. Mar. 31, 2005) ("Moreover, limited discovery that may possibly address the issue of exhaustion would not shed any further light on the merits of his constitutional claims, which the Court has already found to be frivolous and lacking merit.").  Therefore, it is recommended that defendants' Motion to Dismiss be denied on this ground.

21

### 3. Exhaustion

Defendants contend that plaintiff failed to exhaust his administrative remedies prior to commencing this action. Def.'s Mem. of Law at 20-22. Plaintiff argues that he fully exhausted his administrative remedies. Dkt. No. 123-2 at 4 n.3, 13. Plaintiff claims that he appealed his grievance alleging retaliation and harassment to CORC on or about January 2, 2015. Id. at 14. When CORC failed to render a decision within the requisite time frame, he initiated the present action in federal court, "as he was being abused and had no other avenue." Id. Additionally, plaintiff contends that, as to his Eighth Amendment conditions of confinement claims, the grievance supervisor refused to forward his grievances to "administrative [sic] at the highest channels, and when plaintiff attempted to forward [them] [himself], the mail clerks discarded [the mail] so plaintiff was blocked." Pl.'s Mem. of Law ¶ 30.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549

22

U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court of the United States has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, __ U.S. __,136 S. Ct. 1850, 1862 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[25]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart

---

[25] In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S. Ct. at 1858-59).

inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

## 1. Did Plaintiff Exhaust his Administrative Remedies?

There is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.[26] "[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones, 549 U.S. at 216. Nevertheless, failure to exhaust may be the basis for dismissal on a motion to dismiss for failure to state a claim. See id. It is well-settled that:

> If non[-]exhaustion is clear from the face of the complaint (and incorporated documents), a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted.
>
> If non[-]exhaustion is not clear from the face of the complaint, a defendant's motion should be converted, pursuant to Rule 12(b), to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused.

---

[26] First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

Scott v. Gardner, 287 F. Supp. 2d 477, 485 (S.D.N.Y. 2003) (internal quotation marks omitted)

(quoting McCoy v. Goord, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003)).

> If a prisoner chooses to plead facts regarding exhaustion, and those facts show that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim. Simply stated, if a prisoner says nothing or little about exhaustion in his *pro se* civil rights complaint, he is likely protected from a [Rule] 12(b)(6) motion to dismiss premised on failure to exhaust. However, if he says too much about exhaustion in that complaint so that his non-exhaustion is readily apparent, he may "plead himself out of court," as the saying goes.

Trapani v. Pullen, No. 9:14-CV-00556 (TJM/TWD), 2016 WL 1295137, at *6 (N.D.N.Y. Feb.

18, 2016) (internal quotation marks and citations omitted).  To the extent that plaintiff

discusses possible exhaustion, both his complaint and his amended complaint reference filing

grievances, but do not comment on the status of those grievances or the level they were at in

the administrative process.  See generally Compl.; Am. Compl.[27]  Because plaintiff has said

"little" regarding exhaustion his complaints, non-exhaustion is not "readily apparent" from the

face of his complaint.  See Trapini,  2016 WL 1295137, at *6 ; Morgan v. Ward,

No.1:14-CV-7921-GHW, 2016 WL 427913, at *1 (S.D.N.Y. Feb. 2, 2016) ("Because

exhaustion of remedies is an affirmative defense, and the plaintiff's failure to exhaust his

---

[27] Insofar as defendants argue that "plaintiff's own amended complaint states that plaintiff did not exhaust many of his claims," Def.'s Mem. of Law at 5 n.5, the undersigned notes that plaintiff also suggests that there may be an excuse for the failure to exhaust.  In the portion of the amended complaint that defendants cite, plaintiff contends, regarding his Eighth Amendment conditions of confinement claim, that the "grievance supervisor refused to forward plaintiff's grievances to administration at the highest channels, and when plaintiff attempted to forward it [him]self[,] the mail clerks discarded it . . . so plaintiff was blocked." Am. Compl. ¶ 30.  This, plaintiff suggests that administrative remedies may have been unavailable.

remedies is not apparent on the face of the complaint, the motion to dismiss the action in its entirety is denied."); cf. Lewis v. Hanson, No. 9:16-CV-804 (MAD/TWD), 2017 WL 4326084, at *3 (N.D.N.Y Sept. 28, 2017) ("In his July 5, 2016 complaint, Plaintiff states that his 'grievance is pending.' Therefore, it is clear from the face of the complaint that Plaintiff had not exhausted his administrative remedies at the time he initiated this action."); Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *4 (N.D.N.Y. Apr. 8, 2015) (establishing that because the plaintiff's complaint stated "grievance is still pending," it was clear from the face of the complaint that the plaintiff had not exhausted his administrative remedies).

As non-exhaustion is not clear from the face of plaintiff's complaint, in order to consider the documents defendants attach to their motion, defendants' motion must be converted to one for summary judgment for the limited purpose of determining exhaustion. See Gardner, 287 F. Supp. 2d at 487. However, the Federal Rules require that this Court "ensure that the opposing party is given proper notice of the conversion." McCoy, 255 F. Supp. 2d at 251 (citing Villante v. Dep't of Corr. of City of New York, 786 F.2d 516, 521 (2d Cir.1986)). "Such notice is especially important when a plaintiff is pro se; the Second Circuit has required 'unequivocal notice' of conversion." Id. (citing Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 767 (2d Cir.1983)). Defendants have not provided plaintiff with "unequivocal notice" of potential conversion; thus, the undersigned recommends that defendants' Motion to Dismiss be denied without prejudice, with the opportunity to renew by way of a combined motion to dismiss and motion for summary judgment limited to the issue of exhaustion, or, in the

alternative, by way of an exhaustion hearing, should defendants request such a hearing. See Dawkins v. Jones, No. 03Civ.0068(DAB)(AJP), 2005 WL 196537, at *1 (S.D.N.Y. Jan. 31, 2005) (denying the defendants' motion to dismiss because non-exhaustion is unclear from the face of the complaint, and granting leave to renew as a combined motion to dismiss and for summary judgment).

## B. Merits Review of Motion for Summary Judgment

### 1. First Amendment

Plaintiff contends that defendants violated his First Amendment rights by (1) infringing on his freedom of expression; (2) preventing him from freely exercising his religion; (3) subjecting him to retaliation; and (4) infringing on his right of access to the courts. Pl.'s Mem. of Law at 44-54, 69.  Defendants argue that plaintiff fails to establish his entitlement to summary judgment.  Def.'s Mem. of Law at 5-10.

### a. Freedom of Expression and Free Exercise Claims[28]

Plaintiff contends that Supt. Lee, DSS Russo, Lieut. Madison, Lieut. Simmons, Lieut. Sullivan, Deputy Superintendent Wendland, Capt. Webbe, Sgt. Bey, Sgt. Vanacore, Sgt.

---

[28] Plaintiff's freedom of expression claim is "cognizable under the First Amendment's Free Exercise Clause." Shepherd v. Fisher, No. 08-CV-9297 (RA), 2017 WL 666213, at *31 (S.D.N.Y. Feb. 16, 2017). Therefore, plaintiff's freedom of expression claim will be discussed in conjunction with his free exercise claim.

Barg,[29] C.O. Waugh, C.O. Miller, C.O. Williamson, and C.O. Cruz violated his First Amendment free exercise rights by "punish[ing] [him] for expressing his religious belief through his Mohawk hairstyle." Pl.'s Mem. of Law at 44, 49.  The First Amendment protects the right to free exercise of religion.  See generally Cutter v. Wilkinson, 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).

> To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held;    (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective.

Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives — including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted); see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

> The Turner Court determined that the four factors to be considered are: 1) whether there is a rational relationship

---

[29] Plaintiff alleges that Sgt. Barg only violated his free exercise of religion.  Pl.'s Mem. of Law at 48.

28

between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987)).

### i. Sincerely-Held Belief

It is the plaintiff's burden to establish that "the disputed conduct substantially burdens his sincerely held beliefs." Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006) (citing Ford, 352 F.3d at 591)). However, in assessing whether a plaintiff's belief is sincerely held, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004) (quoting Hernandez v. Comm'r, 490 U.S. 680, 699 (1989)) (internal quotation marks omitted).

Defendants contend that they "have no ability to counter plaintiff's bald, conclusory statement of belief, or challenge whether his beliefs related to his hairstyle are 'religious in nature' with any admissible evidence" because of the lack of discovery. Def.'s Mem. of Law at 6. The undersigned agrees, and concludes that the record is insufficient to determine whether plaintiff has a sincerely-held belief in the Anunaki religion.

In Singh v. Goord, the Second Circuit acknowledged the "difficulty of assessing the sincerity of an individual's religious beliefs." Singh v. Goord, 520 F. Supp. 2d 487, 499 (S.D.N.Y. 2007). Nonetheless, it concluded that the plaintiff had established the first prong of

29

the test, as the evidence indicated that:

> 1) plaintiff was born a Sikh, was raised as a Sikh, and regularly attended Sikh services growing up; 2) plaintiff consistently expressed his belief in Sikhism since he was first incarcerated; and that 3) plaintiff has engaged in hunger strikes in protest of the denial of religious exercise, and has continued to adhere to the teachings of his religion, despite being punished for doing so.

Id.

Here, plaintiff offers no evidence as to the sincerity of his religious beliefs other than the conclusory allegation that his "religious belief is sincerely held as [he] is a member of the Anunaki religion." Pl.'s Mem. of Law at 44, 48-49; cf. Panayoty v. Annucci, 898 F. Supp. 2d 469, 482-83 (N.D.N.Y. 2012) (concluding that the plaintiffs' detailed declarations explaining their religion's structure and belief system established that the religion was, "for First Amendment purposes, religious in [its] scheme of beliefs and such beliefs [were] sincerely held."). The record also does not sufficiently support plaintiff's allegation that his Mohawk hairstyle "is religious and represents in part higher conscious [and] resurrection," or that his hairstyle is otherwise related to his sincerely-held religious beliefs. Dkt. No. 123-2 at 5. Further, insofar as plaintiff claims that yoga magazines constitute religious materials, Pl.'s Mem. of Law ¶ 145 — and their confiscation violated his constitutional rights — there is not enough information in the record to establish whether the yoga magazines relate to his faith to amount to religious reading materials.

Moreover, unlike the plaintiff in Singh, there is no indication in the record that plaintiff "consistently expressed his belief . . . since he was first incarcerated"; indeed, the record suggests the opposite. Singh, 520 F. Supp. at 499. In his amended complaint, plaintiff

30

alleges that he is registered "N.o.I." ("Nation of Islam"),[30] and that the defendants prevented him from "attend[ing] services for the month of Ramadan[,] for fasting[,] and Brotherhood with fellow prisoners."  Am. Compl. at 40.  Thus, plaintiff's amended complaint conflicts insofar as he indicates he is a member of the Nation of Islam in one portion of the complaint, and of the Anunkai religion in his Motion for Summary Judgment.  Compare Am. Compl. at 40 ("N.o.I") with Pl.'s Mem. of Law at 44, 48-49 (member of Anunkai religion).  Such inconsistencies in plaintiff's allegations create an issue of material fact regarding the religion with which plaintiff identified that cannot be decided on summary judgment.  See Jordan v. Fischer, 773 F. Supp. 2d 255, 262 (N.D.N.Y. 2011) ("Insofar as Jordan contends that he should be entitled to summary judgment on this claim, the court rejects that contention in light of the factual disputes and inconsistencies in Jordan's allegations.").  Further, plaintiff has not established that he has a sincerely-held belief as a member of multiple religions.  Therefore, the record is unclear as to whether plaintiff has a sincerely-held belief in the Anunaki religion.

### ii. Legitimate Penological Purpose

Even if the undersigned concluded that plaintiff established a "sincerely-held belief" in the Anunkai religion, plaintiff's claim must be denied because defendants establish that they had a legitimate penological purpose.  See Salahuddin, 467 F.3d at 274.  Once a plaintiff has demonstrated a sincerely-held religious belief, the burden shifts to defendants to establish a legitimate penological purpose.  See id.  If a legitimate penological purpose is identified, the

---

[30] Plaintiff varies in the capitalization of "N.o.I."

Court must then assess its reasonableness under the Turner factors set forth above.  See subsection III.B.1.a., supra.

Assistant Commissioner for Correctional Facilities James A. O'Gorman and DSS Russo declared that DOCCS Directive 4914 regulates grooming standards as "hair styles can [ ] be used to hide or transport contraband, including but not limited to, drugs, weapons and unauthorized communications."  Dkt. No. 119-14 ("O'Gorman Decl.") at 3; Dkt. No. 119-15. ("Russo Decl.") at 3.  Thus, because  "[p]revening the smuggling of contraband, such as weapons and drugs, comports with the type of penological interests contemplated under the Turner . . . standard," defendants have set forth a legitimate penological interest.  Benjamin v. Coughlin, 905 F.2d 571, 578 (2d Cir. 1990).  DSS Russo further declares that plaintiff's "disciplinary history has occasions where drugs and smuggling have occurred," and that plaintiff's hairstyle "become[s] difficult to search when the need arises."  Russo Decl. at 4. Plaintiff does not argue that defendants' alleged justification is pretextual, and the record does not support such a conclusion.  See Lowrance v. Coughlin, 862 F. Supp. 1090, 1103 (S.D.N.Y. 1994) ("Plaintiff has successfully demonstrated that the exercise of his First Amendment rights was a substantial factor motivating this transfer, and that the justification offered by the defendants was a pretext.  During plaintiff's incarceration at Auburn, several incidents occurred demonstrating hostility by DOCS personnel toward plaintiff's exercise of his right to religious freedom and free speech.").  Thus, plaintiff has not established that there is no genuine dispute as to any material fact to warrant summary judgment. FED. R. CIV. P. 56(a). Accordingly, it is recommended that plaintiff's Motion for Summary Judgment as to his

freedom of expression and free exercise claims be denied.

### b. Retaliation

Plaintiff contends that his "right to the freedom of speech to file grievances and civil suits is protected, [and] defendants took adverse action against [him] for filing grievances and civil suits about [their] violations of his freedom of expression by him wearing a Mohawk haircut and his free exercise of religion." Pl.'s Mem. of Law at 53.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]'" See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560)). In order to prove an adverse action, a plaintiff must show that the defendant's "'retaliatory conduct . . . would deter a similarly situated individual of ordinary

33

firmness from exercising his or her constitutional rights . . . .  Otherwise, the retaliatory act is simply de minimis, and therefore outside the ambit of constitutional protection.'" Roseboro v. Gillespie, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting Dawes, 239 F.3d at 292-93). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. N.Y., 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128.  The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro, 791 F. Supp. 2d at 367 (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same).

Plaintiff contends that: (1) on or about November 11, 2014, Lieut. Simmons conducted a disciplinary hearing and found plaintiff not guilty of refusing a direct order to cut his hair; (2) on November 29, 2014, Lieut. Madison "complain[ed] about plaintiff being found not guilty";

34

(3) C.O. Cruz "volunteered to assure that plaintiff [would] be punished"; (4) plaintiff filed a grievance against Lieut. Madison; (5) C.O. Cruz directed C.O. Williamson to write plaintiff a misbehavior report for refusal to comply with DOCCS Directive 4914 "out of retaliation for plaintiff's grievances"; (6) on December 23, 2014, Sgt. Bey issued plaintiff a misbehavior report for his refusal to cut his hair "out of retaliation again after plaintiff was not found guilty on two occasions"; (7) on January 16, 2015, Deputy Superintendent Wendland conducted a misbehavior hearing and found plaintiff guilty for refusing to cut his hair; (8) C.O. Kozak issued plaintiff a frivolous misbehavior report for unspecified behavior; (9) C.O. Waugh subjected plaintiff to retaliatory searches "out of retaliation"; (10) Capt. Webbe, DSS. Russo, and Supt. Lee "refused to stop their subordinates and punished plaintiff out of retaliation for plaintiff's grievances"; (11) in April 2015, Lieut. Simmons conducted a disciplinary hearing and found plaintiff guilty of refusing a direct order to cut his hair; and (12) C.O. Miller, Sgt. Vanacore, and Sgt. Barg "punished plaintiff for refusing to cut his hair . . . out of retaliation for plaintiff writing grievance [sic] and wearing a Mohawk hairstyle." Pl.'s Mem. of Law at 53-56.

Although plaintiff alleges that defendants retaliated against him because he filed grievances, plaintiff's own recitation of the facts also suggests that defendants retaliated against him because he was found not guilty at disciplinary proceedings, wore a Mohawk hair style, or some combination of the two. See Pl.'s Mem. of Law at 53-56. Thus, defendants' alleged motive is unclear. First, plaintiff has not established that his grievances were a "substantial or motivating factor" for defendants' alleged adverse action. Cole v. Fischer, 416 F. App'x 111, 113 (2d Cir. 2011) (summary order) ("To show retaliation, [the plaintiff] was

required to present evidence that his constitutionally protected conduct in filing past grievances was a substantial or motivating factor for a prison official's adverse action.") (citing Bennett v. Goord, 343 F.3d 122, 137 (2d Cir. 2003)).  Second, to the extent that plaintiff suggests that his Mohawk hair style – which he wore as an expression of his religion – was the "substantial or motivating factor" for defendants' alleged adverse action, plaintiff must establish that "the disputed conduct substantially burden[ed] his sincerely[-] held religious beliefs." Washington v. Gonyea, 538 F. App'x 23, 26 (2d Cir. 2013) (summary order).  Even if it were clear that plaintiff was arguing that his religion was a substantial or motivating factor for defendants' conduct, because plaintiff has not demonstrated that he has a sincerely-held religious belief, he cannot show defendants' conduct "burdened" a sincerely-held religious belief. Washington, 538 F. App'x at 26.  Thus, plaintiff fails to demonstrate that his religion, through his hair style, was a substantial or motivating factor for defendants' conduct.  Finally, insofar as plaintiff suggests that his "not guilty" disposition at a disciplinary hearing was a substantial and motivating factor for defendants' conduct, such circumstantial evidence may establish a causal connection between a plaintiff's conduct and a defendant's adverse action, but does not constitute protected conduct.  See Barclay, 477 F. Supp. 2d at 558 ("Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, *finding of not guilty at the disciplinary hearing*, and statements by defendants as to their motives.") (emphasis added).  Accordingly, it is recommended that plaintiff's Motion for Summary Judgment as to his retaliation claims be denied.

### c. Access to the Courts

Plaintiff contends that Deputy Calao violated his right of access to the courts by "refus[ing] to appoint [him] an inmate law clerk and instead forc[ing] [him] to use a book request system." Pl.'s Mem. of Law at 69-70.  Plaintiff further contends that Mr. Jennings and Ms. Labatte delayed sending his appeal brief relating to a state court claim and denied him copies.  Id.

### i. Inmate Law Clerk

Plaintiff contends that Deputy Calao knew that "plaintiff was keeplocked confined and couldn't physically get to the law library to do research and need[ed] a law clerk to assist him." Pl.'s Mem. of Law at 69.  Instead, Deputy Calao "refused to appoint plaintiff [an] inmate law clerk and [ ] forced plaintiff to use a book request system making research very hard and time consuming." Id. Defendants argue that (1) plaintiff cannot allege actual injury; and (2) plaintiff does not have a constitutional right to an inmate law clerk.  Def.'s Mem. of Law at 14-15.

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds v. Smith, 430 U.S. 817, 828 (1977); see also Lewis v. Casey, 518 U.S. 343, 351 (1996).  This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program was subpar in some theoretical sense."  Lewis, 518 U.S. at 351.  Thus, to

37

demonstrate an actionable injury, "a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury." Vega v. Artus, 610 F. Supp. 2d 185, 201 (N.D.N.Y. 2009) (citations omitted); see also Lewis, 518 U.S. at 351-52 (explaining the actual injury requirement).  Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials." Warburton v. Underwood, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) (citations omitted); Shine v. Hofman, 548 F. Supp. 2d 112, 117-18 (D. Vt. 2008) (explaining that actual injury "is not satisfied by just any type of frustrated legal claim because the Constitution guarantees only the tools that inmates need in order to attack their sentences . . . and . . . challenge the conditions of their confinement.") (internal quotation marks and citations omitted).

Plaintiff does not establish in non-conclusory terms that Dept. Calao deliberately and maliciously denied him legal assistance. See Pl.'s Mem. of Law at 71.  Plaintiff solely argues that "[d]efendant[ ] Calao . . . deliberately violated [his] right of access to the courts."). Moreover, the record lacks evidence of Dep. Calao's intent.  Insofar as plaintiff contends that the book request system did not amount to legal assistance, courts tend to give "close scrutiny to . . . remote control arrangements" – like book request systems – "[b]ecause of the practical difficulties in doing research without free access to a library." Griffin v. Coughlin, 743 F. Supp. 1006, 1023 (N.D.N.Y. 1990) (internal quotation marks and citation omitted).  The Griffin Court found that a book request system failed to provide the plaintiffs with "meaningful, adequate access to the courts," relying on the plaintiffs' allegations that they were unable to "browse

through materials in order to compare legal theories and formulate ideas," "experience[d] delays in receiving books," and "receive[d] books other than the ones they requested." Id. at 1023-24. The record here lacks such allegations. Plaintiff merely alleges that the book request system was "very hard and time consuming." Pl.'s Mem. of Law at 69. However, he does not contend that he was unable to obtain the legal materials he requested.

Even assuming Deputy Calao acted deliberately and maliciously in denying plaintiff an inmate law clerk, the record does not establish that Deputy Calao's alleged denial resulted in actual injury. See Lewis, 518 U.S. at 351-52 (explaining the actual injury requirement). Plaintiff's contentions that he "lost a civil suit against the City of Utica Police Department for brutality that [he] was unable to appeal because he had no help and was denied copies[,] [and] also [ ] was unable to do Article 78 to the Court" are not supported in the record. Pl.'s Mem. of Law at 70. Thus, it is unclear whether Deputy Calao impeded plaintiff's meritorious claim. As the record is unclear as to whether plaintiff suffered actual injury due to Deputy Calao's denial of an inmate law clerk, it is recommended that plaintiff's Motion for Summary Judgment as to his access to the courts claim against Deputy Calao be denied.

### ii. Interference with Legal Mail

Plaintiff contends that Mr. Jennings and Ms. Labatte "held [his] appeal brief for three weeks before mailing it and once the court received it, it was untimely and dismissed." Pl.'s Mem. of Law at 70. Plaintiff further claims that if Mr. Jennings and Ms. Labatte had "sent [his] appeal brief expeditiously as they supposed too [sic] plaintiff would have won his appeal and

been released from prison." Id. Further, plaintiff contends that Mr. Jennings and Ms. Labatte denied him copies. Pl.'s Mem. of Law at 69-70. Defendants argue that plaintiff does not have a constitutionally-protected right to "expeditious mail delivery." Def.'s Mem. of Law at 15.[31]

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted). To state a prima facie access to the courts claim based on interference with legal mail, the plaintiff must establish (1) that a prison official deliberately and maliciously interfered with his or her mail, and (2) that interference caused actual injury. Id. (citation omitted). Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials." Warburton, 2 F. Supp. 2d at 312 (citations omitted). Without identification of the underlying action which was prejudiced, actual injury, and by extension a First Amendment violation, cannot be established. See Christopher v. Harbury, 536 U.S. 403, 415 (2002) ("[T]he underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.").

First, plaintiff has failed to establish, and there is no indication in the record, that either Mr. Jennings or Ms. Labatte deliberately or maliciously interfered with his mail. Plaintiff makes no mention of Mr. Jennings or Ms. Labatte's conduct, beyond the conclusory allegation that

---

[31] Defendants note that plaintiff brought this First Amendment access to the courts claim against Ms. Labatte in a prior lawsuit. See Dkt. No. 119-11 at 8-9; Fox v. Labatte, No. 9:15-CV-0144 (LEK/DJS), 2016 WL 1266958 (N.D.N.Y. Mar. 31, 2016). Because the Court in Fox v. Labatte concluded that plaintiff "did not exhaust all of his available administrative remedies prior to bringing the within action," his claim was dismissed without prejudice, and, therefore, he is not barred from bringing the claim in the present action. See Leal v. Johnson, 315 F. Supp. 2d 345, 347 (W.D.N.Y.) ("Thus, although the exhaustion requirement is not jurisdictional, Richardson v. Goord, 347 F.3d 431 (2d Cir. 2003), where it appears that plaintiff has begun, but not completed, the grievance procedure, the appropriate course would be to dismiss the action without prejudice to allow plaintiff to meet the exhaustion requirement.") (internal citation omitted).

they continued to deny plaintiff "copies," and because of those denials, plaintiff "lost a non-frivolous [sic] claim." Pl.'s Mem. of Law ¶ 143.   Second, even if plaintiff had demonstrated intent, plaintiff has not established actual injury. With regard to the "non-frivolous [sic] claim," plaintiff claims that if Mr. Jennings and Ms. Labatte had "sent [his] appeal brief expeditiously as they supposed too [sic] plaintiff would have won his appeal and been released from prison." Id. at 70.   In support of that contention, plaintiff proffers a letter dated December 25, 2014 that he contends he sent to Ms. Labatte concerning "advance forms and mail" that Ms. Labatte was "holding" and "slowing up [his] access to the court, legal support, and to the statesmen." Dkt. No. 111-2 at 34.   Plaintiff also proffers an Appellate Division scheduling notice, dated April 9, 2015, setting an appeal briefing schedule.   Id. at 34. However, as defendants argue, the Appellate Division scheduling notice plaintiff submits is dated April 5, 2015; thus, the scheduling notice cannot coincide with any lawsuit plaintiff referenced in the December 25, 2014 letter to Ms. Labatte because the scheduling notice is dated four months after the issue plaintiff claims in his letter. Compare Dkt. No. 111-2 at 32 with Dkt. No. 111-2 at 34.   If the scheduling notice does coincide with the issue plaintiff references in the December 25, 2014 letter, plaintiff has failed to demonstrate this connection. Therefore, because plaintiff fails to identify the underlying cause of action he alleges Mr. Jennings and Ms. Labatte have prejudiced by denying him required copies and failing to expeditiously send mail, it is recommended that plaintiff's Motion for Summary Judgment as to his access to the courts claim be denied.

### d. Access to Reading Materials

As to plaintiff's claim about denial of access to the remaining magazines, which he does not allege were religious in nature, plaintiff contends that Capt. Webbe, Lieut. Simmons, and Supt. Lee violated his constitutional rights by denying him access to magazines. Pl.'s Mem. of Law at 67. Plaintiff's claim, however, cannot stand because inmates do not have a constitutional right to privileges such as reading materials. See generally Montalvo v. Lamy, 139 F. Supp. 3d 597, 605 (W.D.N.Y. 2015) ("[P]risoners have no constitutional right to access a commissary."); Rosales v. LaValley, No. 9:11-CV-106 (MAD/CFH), 2014 WL 991865, at *11 (N.D.N.Y. Mar. 13, 2014) ("It is well established that prison inmates do not have a constitutional right to watch television because the amenity is not considered a necessity for inmates."). Plaintiff has no constitutional right to non-religious magazines or other reading materials. Therefore, it is recommended that plaintiff's Motion for Summary Judgment is denied as to his denial of non-religious reading materials claim.

### 2. Fourth Amendment

Plaintiff contends that Sgt. Connor, C.O. Williamson, and C.O. Cruz violated his Fourth Amendment rights during a search/strip search and cell search. Pl.'s Mem. of Law at 65-66. Defendants argue that "plaintiff cannot establish that [ ] conduct by any defendant violated the Fourth Amendment." Def.'s Mem. of Law at 12. The Fourth Amendment establishes that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures[ ] shall not be violated." U.S. CONST. amend. IV. Generally, inmates are not afforded

the same privacy rights as non-inmates because "[l]oss of . . . privacy [is an] inherent incident[
] of confinement." Bell v. Wolfish, 441 U.S. 520, 536 (1979); see Nash v. McGinnis, 315 F.
Supp. 2d 318, 320 (W.D.N.Y. 2004) ("One of the incidents of confinement for a convict is the
loss of privacy, which serves the legitimate purpose of retribution as well as the institutional
security needs of the prison system.  We therefore hold that 'society is not prepared to
recognize as legitimate any subjective expectation of privacy that a [convict] might have in his
prison cell.'") (quoting Willis v. Artuz, 301 F.3d 65, 69 (2d Cir. 2002)).  "Strip frisks pass
constitutional muster, even if the strip frisk is conducted without probable cause, so long as
the search is reasonable and not abusive." Shabazz v. Pico, 994 F. Supp. 460, 473 (S.D.N.Y.
1998) (citing Bell, 411 U.S. at 558-60)).  In assessing reasonableness under the Fourth
Amendment, "[c]ourts must consider the scope of the particular intrusion, the manner in which
it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441
U.S. at 558.


### a. Cell Search

Insofar as plaintiff contends that Sgt. Connor, C.O. Williamson, and C.O. Cruz violated
his Fourth Amendment rights during a cell search, "[t]he Supreme Court has held that searches
of prison cells do not implicate protected constitutional rights; prisoners have no reasonable
expectation of privacy within the confines of their cell." Leitzsey v. Coombe, 998 F. Supp. 282,
289 (W.D.N.Y. 1998) (citing Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)); DeMaio v.
Mann, 877 F. Supp. 89, 95 (N.D.N.Y. 1995) ("Searches of prison cells, *even arbitrary*

*searches*, implicate no protected constitutional rights.") (emphasis added).    Therefore, it is recommended that plaintiff's Motion for Summary Judgment on his Fourth Amendment claim regarding cell searches be denied.

### b. Strip Search/Frisk

Plaintiff contends that C.O. Williamson "pat frisked and strip frisked" plaintiff by forcing him "to remove his religious headgear and shake his hair out." Pl.'s Mem. of Law at 65, ¶ 11. Defendants argue that the "removal of headgear, and shaking out one's hair" fails to implicate a right to bodily privacy as a matter of law.  Def.'s Mem. of Law at 12.  The undersigned agrees with defendants. Plaintiff fails to establish, and the record does not suggest, that it was unreasonable for C.O. William to order plaintiff to remove his headgear and shake his hair during the search. See Rodriguez v. Mercado, No. 00 CIV. 8588 JSRFM, 2002 WL 1997885, at *1, 6 (S.D.N.Y. Aug. 28, 2002) (determining that the defendant corrections officer's request that the plaintiff remove his "religious hat" and search his hair during a search did not violate the plaintiff's Fourth Amendment rights).  Plaintiff does not allege that the search was abusive, nor does he detail the manner in which either C.O. Williamson or C.O. Cruz conducted the search beyond stating that C.O. Williamson "directed [him] to get against the wall" and "pat frisked and strip frisked" him.  Am. Compl. at 10-11;[32] see Shabazz, 994 F. Supp. 460, 473 (S.D.N.Y. 1998) ("Strip frisks pass constitutional muster, even if the strip frisk is conducted without probable cause, so long as the search is reasonable and not abusive.") (citing Bell,

---

[32] Plaintiff contends that C.O. Williamson and C.O. Cruz strip frisked him, but does not allege that he removed his clothing during the incident.  Am. Compl. at 10-11.

411 U.S. at 558-60)).  As there is no evidence that the search was unreasonable or abusive, it is recommended that plaintiff's Motion for Summary Judgment as to his Fourth Amendment claim regarding a strip/pat frisk be denied.

### 3. Eighth Amendment

Plaintiff contends that Supt. Lee, Capt. Webbe, Lieut. Simmons, Lieut. Sullivan, and C.O. Henry violated his Eighth Amendment rights by subjecting him to cruel and unusual punishment due to the conditions of his confinement.  Pl.'s Mem. of Law at 59-64.  Plaintiff further contends that C.O. Cruz violated his Eighth Amendment rights by subjecting him to excessive force and sexual harassment.  Id. at 72.

### a. Conditions of Confinement

Plaintiff contends that the aforementioned defendants "locked [him] in a cell that had no feed up slot to receive meals."  Pl.'s Mem. of Law at 59.  Plaintiff was forced to "climb up the bars" of his cell[33] and "slide his food through the slot in the ceiling," which forced him "to eat food with hair, paint chips, and dust in it."  Id. at 59-60.  Plaintiff further claims that his cell "had urine and feces on and in the toilet, and green spittal [sic] in the sink," and that defendants denied him cleaning supplies.  Id. at 60.  Moreover, plaintiff contends that his cell "was directly across from a window that had a 8 to ten inch hole in it and the weather outside was ten

---

[33] As indicated earlier, plaintiff also suggests that he had to climb stairs in order to reach his food tray.  Thus, the record is unclear as to whether plaintiff's only method of retrieving his food was to climb his cell bars or if he also had access to stairs.  Supra at 8 n.13.

degrees," and defendants refused to provide him with clothing, additional blankets, or heat. Id. at 60-61. Defendants argue that plaintiff fails to establish that Supt. Lee, C.O. Henry, Capt. Webbe, Lieut. Sullivan, and Lieut. Simmons were personally involved in creating or contributing to the alleged adverse conditions. Def.'s Mem. of Law at 11-12.

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Objectively, the deprivation must be "sufficiently serious [such] that [the inmate] was denied the minimal civilized measure of life's necessities[.]" Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted). To satisfy the subjective prong of the test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind . . . such as deliberate indifference to inmate health or safety." Id. (internal quotation marks and citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002).

The objective prong of the test can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the plaintiff's] health[.]" Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). There is no "static test" to determine whether an alleged deprivation is sufficiently serious to satisfy the objective prong. Id. Rather, courts must determine whether

the conditions violate "contemporary standards of decency." Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)) (additional citation omitted).

### i. Unsanitary Cell Conditions

Plaintiff contends that he was "confined to a cell that had urine and feces on and in the toilet, and green spittal [sic] in the sink." Pl.'s Mem. of Law at 60. Courts have held that "chronic exposure to human waste will give rise to a colorable [§ 1983] claim." Florio v. Canty, 954 F. Supp. 2d 227, 234 (S.D.N.Y. 2003) (internal quotation marks omitted) (quoting Ortiz v. Dep't of Corr., No. 08 Civ. 2195, 2011 WL 2638137, at *6 (S.D.N.Y. Apr. 29, 2011), report and recommendation adopted, 2011 WL 2638140 (S.D.N.Y. July 5, 2011). In Florio, the Southern District of New York dismissed the plaintiff's Eighth Amendment claim, finding that the plaintiff's exposure to waste in his cell was "only for brief periods" totaling "less than a few hours," and, therefore, "simply too minor to state an Eighth Amendment claim." Florio, 954 F. Supp. 2d at 235. In Gaston v. Coughlin, the Second Circuit held that the plaintiff's exposure to "human feces, urine, and sewage water" for "several consecutive days" constituted an Eighth Amendment violation. Gaston v. Coughlin, 249 F.3d 156, 165-66 (2d Cir. 2001).

Here, plaintiff does not allege how long the feces and urine remained in or on the toilet or how long the spittle remained in the sink; instead, he states that he was "forced to live in these conditions for months."[34] See Pl.'s Mem. of Law at 61. There is no indication that the feces, urine, or spittle amounted to anything other than "stains," plaintiff's own allegations

---

[34] It is unclear if plaintiff is referring to the unsanitary conditions or the cold temperatures. See Pl.'s Mem. of Law at 61.

47

indicate that those stains were confined to plaintiff's toilet and sink. Pl.'s Mem. of Law at 60; cf. Florio, 954 F. Supp. 2d at 238 (noting that the human waste was not limited to the plaintiff's toilet, but, instead, "ankle high" in his cell).  Therefore, based on the current record, the undersigned cannot determine whether the conditions in plaintiff's cell constituted "chronic exposure" to give rise to an Eighth Amendment claim.  See Florio, 954 F. Supp. 2d at 234 (quoting Ortiz, 2011 WL 2638137 at *6).

However, even assuming that plaintiff's cell conditions met the objective component of the test, plaintiff has not established that defendants had a "sufficiently culpable state of mind" to satisfy the subjective component.  See Walker, 717 F.3d at 125.  Aside from plaintiff's conclusory allegation that "defendants deliberately and maliciously subjected [him] to cruel and unusual punishment," the record lacks evidence regarding Capt. Webbe, Supt. Lee, Lieut. Simmons, and Lieut. Sullivan's mental state.  Pl.'s Mem. of Law at 63.  Moreover, the record does not suggest that Capt. Webbe, Lieut. Simmons, and Lieut. Sullivan had any control over his cell conditions.  See generally Felix-Torres v. Graham, 687 F. Supp. 2d 38, 52 (N.D.N.Y. 2009) ("[E]ven if the Court were to find that some admissible record evidence exists that Defendant Ryerson had a supervisory role in assisting qualified inmates in obtaining lower bunk assignments, the Court can find no admissible record evidence that Defendant Ryerson, as a supervisor, was personally involved in the constitutional violations alleged.").  Insofar as plaintiff contends that Supt. Lee "knew about . . . [the] conditions and refused to do anything," Pl.'s Mem. of Law at 61, plaintiff's conclusory statement, unsupported by any details of when or the manner in which Supt. Lee learned of the conditions, fails to establish a culpable mental

state.  See Walker, 717 F.3d at 125.

To the extent that plaintiff suggests that the denial of cleaning supplies demonstrates that defendants had a culpable mental state regarding his allegedly dirty cell, the record is unclear as to whether Capt. Webbe, Supt. Lee, Lieut. Simmons, and Lieut. Sullivan knew or were aware that plaintiff had been denied cleaning supplies as plaintiff does not specifically allege that he requested the cleaning supplies from these defendants or that it was these defendants who denied his request.  See Ortiz, 2011 WL 2638137 at *9 ("Plaintiff does not sufficiently allege that defendants actually knew of and disregarded a substantial risk to plaintiff's health or safety, or that defendants were aware of facts from which they could have inferred that there was a substantial risk of serious harm, that they drew such an inference and that they disregarded it.").  Additionally, the denial of cleaning supplies, without more, does not give rise to an Eighth Amendment violation.  See Gonzales v. Hasty, 269 F. Supp. 3d 45, 53-54, 64 (E.D.N.Y. 2017) (concluding that the defendants' failure to supply the plaintiff cleaning supplies when they knew the plaintiff's cell was dirty is "not the type of claim[ ] that the Eighth Amendment is meant to remedy."); Dolberry v. Levine, 567 F. Supp. 2d 413, 417-18 (W.D.N.Y. 2008) (citing cases for the proposition that denial of cleaning supplies does not amount to a constitutional violation).

Moreover, although plaintiff contends that he suffered "small bumps on his body from the dirty cell," even if plaintiff were to demonstrate that the "bumps" were caused by his cell condition, de minimis injury does not amount to a constitutional violation.  See id. (finding that the plaintiff's skin rash is a de minimis injury that does not give rise to a constitutional claim).

49

Therefore, because plaintiff has not established both the subjective and objective components of an Eighth Amendment analysis, it is recommended that his Motion for Summary Judgment as to his Eighth Amendment claim regarding unsanitary cell conditions and denial of cleaning supplies be denied.

### ii. Cold Living Conditions

Plaintiff alleges that defendants subjected him to "nearly two weeks of extreme cold weather," as "civilians" repaired holes in the windows of or adjacent to his cell. Pl.'s Mem. of Law ¶ 42. During this time, Supt. Lee denied him additional blankets. Id. The Second Circuit has held that exposure to severely cold temperatures for an extended period of time may constitute an Eighth Amendment violation. See Corselli v. Coughlin, 842 F.2d 23, 37 (2d Cir. 1988) (reversing the district court's grant of summary judgment where the plaintiff established that he was exposed to "bitterly cold temperatures for approximately three months."); Gaston, 249 F.3d at 165 (reversing the district court's grant of summary judgment where the plaintiff alleged that the windows in his cell block "remained unrepaired the entire winter, exposing him to freezing and sub-zero temperatures.").

Plaintiff clearly states that he was exposed to the cold for "nearly two weeks," which is below the thresholds that courts in this district have found sufficient to amount to an Eighth Amendment violation. See Corselli, 842 F.2d at 37 (three months); Gaston, 249 F.3d at 165 ("the entire winter"); cf. Cusamano v. Carlsen, No. 9:08-CV-755 (FJS/GHL), 2011 WL

50

7629512, at *8 (N.D.N.Y. Dec. 16, 2011) (concluding that the plaintiff's exposure to the cold for "about two weeks" was not "so serious" as to amount to an Eighth Amendment violation). Although plaintiff contends that Supt. Lee "refuse[d] to give [him] . . . extra clothing" after C.O. Williamson took "all" of plaintiff's clothing, wearing the same clothes for two weeks does not amount to a constitutional violation. See Crichlow v. Fischer, No. 9:17-CV-00194 (TJM/TWD), 2017 WL 6466556, at *13 (N.D.N.Y. Sept. 5, 2017) (citing cases for the proposition that there is "no Eighth Amendment Violation where [an] inmate was forced to wear the same uniform for three weeks."); Mortimer Excell v. Fischer, No. 9:08-CV-945 (DNH/RFT), 2009 WL 3111711, at *5 (N.D.N.Y. Sept. 24, 2009) (finding no Eighth Amendment violation where the plaintiff was forced to wear the same clothes for two weeks).  Insofar as plaintiff suggests that Supt. Lee deprived him of sufficient clothing for the cold temperatures, defendants refute plaintiff's allegation that it was "ten degrees," Pl.'s Mem. of Law at 60, contending that the temperature in the west wing was "estimated to be 67-71 degrees."   Dkt. No. 118-1 at 4. Thus, a disputed issue of fact remains as to whether Supt. Lee deprived plaintiff of sufficient clothing for the requisite temperature.

As to plaintiff's claim that Supt. Lee denied him additional blankets, although courts have found an Eighth Amendment violation "when a plaintiff is subjected to extreme cold for an extensive period of time," Vaiana v. Nassau Cty. Dept. of Corr., No. 11-CV-1013 (JFB) (WDW), 2012 WL 541086, at *4 (E.D.N.Y. Feb. 21, 2012), based on the facts plaintiff alleged, he has not demonstrated that he was subjected to the cold for an extensive period of time. Although there is no bright-line rule, plaintiff has not established that two weeks of exposure

to cold cell temperatures amounts to an "extensive period of time." See Corselli, 842 F.2d at 37; Gaston, 249 F.3d at 165. Further, there exist disputed facts regarding the cell temperatures as defendants argue that the cell temperature was "estimated to be 67-71 degrees." Dkt. No. 118-1 at 4.

Even assuming that plaintiff's cell conditions met the objective component of the test, plaintiff has not established that defendants had a "sufficiently culpable state of mind" to satisfy the subjective component. See Walker, 717 F.3d at 125. Aside from plaintiff's conclusory allegation that "defendants deliberately and maliciously subjected [him] to cruel and unusual punishment," Pl.'s Mem. of Law at 63, there is no evidence regarding Capt. Webbe, Supt. Lee, Lieut. Simmons, and Lieut. Sullivan's mental state. See Gaston, 249 F.3d at 164 (citing cases for the proposition that the Second Circuit has applied the deliberate indifference standard to assess conditions of confinement claims). Further, the record does not support a contention that Capt. Webbe, Supt. Lee, Lieut. Simmons, and Lieut. Sullivan "knew of and disregarded an excessive risk," Farmer, 511 U.S. at 837, to plaintiff's health or safety because, as plaintiff himself claims, the windows were repaired within two weeks. Pl.'s Mem. of Law ¶ 42; see Cusamano, 2011 WL 7629512, at *8 (concluding that the plaintiff's exposure to the cold for "about two weeks" was not "so serious" as to amount to an Eighth Amendment violation). Moreover, plaintiff has not demonstrated that there is no genuine dispute of material fact as to his allegations regarding the lack of heat. See Dkt. No. 118-1 at 4 (alleging that the temperature in the west wing was "estimated to be 67-71 degrees."). Therefore, because plaintiff cannot establish both the subjective and objective components of an Eighth

Amendment analysis, it is recommended that his Motion for Summary Judgment as to his Eighth Amendment claims regarding his exposure to cold temperatures be denied.

### iii. "Feed-Up Slot"

Plaintiff contends that his cell did not have a "feed-up slot to receive meals." Pl.'s Mem. of Law at 59.  Because defendants did not open plaintiff's door to hand him his food, plaintiff had to "climb up the bars and slide his food through the slot by the ceiling."[35] Id.  Plaintiff fell "from being forced to climb up the bars to receive his [trays]" and "injured his back and had to be admitted to the prison hospital for nearly a week," and use a cane.  Id. at 60.[36] An inmate may not be deprived of "basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety."  Helling v. McKinney, 509 U.S. 25, 32 (1993).  While, "no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension."  Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (internal citation omitted).  "To establish a valid claim that the denial of food . . . constitutes an Eighth Amendment violation, one must establish that there was a sufficiently serious condition that resulted from the food not being received.  A condition is serious for constitutional purposes if it presents a condition of urgency that may result in degeneration or extreme pain."

---

[35] As indicated, plaintiff also suggests that he had to climb stairs in order to reach his food tray.  Supra at 8 n.13, 44 n. 33.

[36] In his Facts section, plaintiff alleges that he remained in the hospital for three days.  Pl.'s Mem. of Law ¶ 34.

Lewis v. Zon, 920 F. Supp. 2d 379, 387 (W.D.N.Y. 2013) (internal quotation marks and citations omitted).

Plaintiff does not allege that defendants outright denied him food, rather, that the cell's configuration required him to climb to retrieve his meals, eventually resulting in injury and that the process of retrieving his food tray resulted in the contamination of his food. See Pl.'s Mem. of Law at 59-60. Defendants contend that the injuries plaintiff references were caused by plaintiff's falling and/or slipping on ice, not by falling in his cell while retrieving his food tray, a contention that plaintiff's medial records supports. Dkt. No. 118-1 at 4 ("Plaintiff fell off a chair and slipped on ice); see Dkt. No. 123-4 at 33 ("Pt. fell off chair c/o back pain."). Moreover, as noted, plaintiff also suggests that his cell contained "steps" that he used to reach his food trays, conflicting with his allegation that he was forced to "climb up the bars." Compare Pl.'s Mem. of Law ¶ 35 ("I was put on a unit that didn't require [me] to use the steps.") with Pl.'s Mem. of Law at 60 (alleging that he was "forced to climb up the bars" to receive his food tray). However, the lack of a feed-up slot at the ground level of plaintiff's cell arguably "pose[d] an unreasonable risk of serious damage to [the plaintiff's] health," and satisfies the objective component. See Darnell, 849 F.3d at 30.

Plaintiff does not allege, and the record does not suggest, that Capt. Webbe, Lieut. Simmons, Lieut. Sullivan, Supt. Lee, or C.O. Henry assigned plaintiff to this cell, had control over an inmate's placement in a particular cell, or had the ability to transfer plaintiff out of the cell. Plaintiff does not claim in nonconlusory terms that Capt. Webbe, Lieut. Simmons, Lieut. Sullivan, or Supt. Lee were aware of the lack of a "feed-up slot" in plaintiff's cell or were aware

that plaintiff's required method of obtaining his food tray put him at risk of injury.

To the extent that plaintiff contends that his food contained "hair, paint chips and dust" because he "had to take the lid off" to slide the tray through the "opening in the ceiling," which caused these particles to fall into his food, Pl.'s Mem. of Law at 60, such claim "could be characterized as a sufficiently serious prison condition to satisfy the objective prong of a conditions-of-confinement claim." Gray v. Metro. Det. Cntr., No. 09-CV-4520(KAM)(LB), 2011 WL 2847430, at *11 (E.D.N.Y. July 15, 2011) (concluding that an "allegedly contaminated meal . . . could be characterized as a sufficiently serious prison condition to satisfy the objective prong."). However, plaintiff does not allege, and the record does not suggest, that Capt. Webbe, Lieut. Simmons, Lieut. Sullivan, or Supt. Lee placed the hair, paint chips, or dust in plaintiff's food, nor is there any indication that they knew that the way in which plaintiff received his food tray caused these particles to fall into plaintiff's food. See id. ("Plaintiff has not alleged that either of the [i]ndividual [d]efendants had actual knowledge that plaintiff's food was contaminated at the time they served it."). As plaintiff has not established that defendants intentionally contaminated his food, plaintiff has not demonstrated an Eighth Amendment violation. Gray, 2011 WL 2847430, at *11

As plaintiff has failed to establish that there is no genuine dispute as to any material fact to warrant summary judgment, it is recommended that plaintiff's Motion for Summary Judgment as to his Eighth Amendment claims relating to the lack of a "feed-up slot" at ground level be denied. FED. R. CIV. P. 56(a). Moreover, insofar as plaintiff suggests that C.O. Henry harassed him by "call[ing] him a monkey" and "teas[ing]" him for having to climb to obtain his

food tray, Pl.'s Mem. of Law at 59, "[a]llegations of verbal abuse, without more, generally fail to state an actionable claim under the Eighth Amendment." Morrison v. Hartman, 898 F. Supp. 2d 577, 584 (W.D.N.Y. 2012). Thus, plaintiff has failed to demonstrate C.O. Henry violated his Eighth Amendment rights on this ground.

### b. Excessive Force

Plaintiff contends that, during a pat frisk, C.O. Cruz "kicked plaintiff's feet apart, pulled plaintiff's pants between his buttocks and banged plaintiff's head against the wall." Pl.'s Mem. of Law at 72. As a result, plaintiff sustained a "permanent knot on the right side of [his] forehead." Id. "The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015) (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)). To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element of the excessive force analysis is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm  [ ] constitute[s an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from

constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson, 503 U.S. at 7). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;]  [2] . . . the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Plaintiff has not established that there is no genuine dispute as to any material fact as to whether C.O. Cruz used excessive force, and whether that force was malicious. See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (internal quotation marks and citation omitted) ("[T]he malicious use of force to cause harm constitutes an Eighth Amendment violation[ ] per se . . . whether or not significant injury is evident."). Although plaintiff submits medical records

in support of his motion, they do not pertain to the incident with C.O. Cruz. <u>See</u> Dkt. No. 111-2 at 20-23.  Further, it is unclear if plaintiff sought medical treatment after the incident.  <u>See</u> <u>Henry v. Brown</u>, No.14-CV-2828 (LDH)(LB), 2016 WL 3079798, at * (E.D.N.Y. May 27, 2016) ("[W]here undisputed medical records directly and irrefutably contradict a plaintiff's descriptions of his injuries attributed to an alleged use of excessive force, no reasonable jury could credit plaintiff's account of the happening.")(internal citation and quotation marks omitted).  Nonetheless, "any or even no injuries resulting from the events plaintiff described could amount to a per se constitutional violation." <u>Brown v. Dubois</u>, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at *9 (N.D.N.Y. June 16, 2017) (citing <u>Baskerville v. Mulvaney</u>, 411 F.3d 45, 48-49 (2d Cir. 2005)); <u>Tafari v. McCarthy</u>, 714 F. Supp. 2d 317, 352 (N.D.N.Y. 2010) (internal quotation marks and citation omitted) (denying the defendants' motion for summary judgment because although the plaintiff's injuries were de minimis, "the extent of injury suffered by the inmate is only one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.").

Assessing the subjective prong of the excessive force analysis, plaintiff does not set forth C.O. Cruz's alleged mental state other than to claim that C.O. Cruz was "furious" that plaintiff submitted a grievance against him.[37]  Pl.'s Mem. of Law at 73.  Other than plaintiff's self-serving allegation, the record does not contain enough factual background as to C.O.

---

[37] Plaintiff does not bring a retaliation claim against C.O. Cruz for this incident.  <u>See</u> subsection II.C.2. <u>supra</u>.

Cruz's mental state at the time of the pat-frisk to conclude that he acted maliciously or sadistically. See Sims, 230 F.3d at 21; Santiago v. C.O. Campisi Shield No. 4592, 91 F. Supp. 2d 665, 668, 673 (S.D.N.Y. 2000) (concluding that the plaintiff's allegations that the defendant "singled him out to punish him for their altercation the day before," and "assaulted him without provocation," satisfied the subjective prong of the Eighth Amendment analysis). Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to excessive force claim against C.O. Cruz, be denied.

### c. Sexual Harassment

Plaintiff contends that during a frisk on January 25, 2015, C.O. Cruz "intentionally made contact with [his] genitalia, buttock[s], thighs and chest in a [sic] intimate dominatrix way that served no penological purpose and was undertaken with the intent to humiliate [him]." Pl.'s Mem. of Law at 72. Plaintiff claims that C.O. Cruz "began to go up plaintiff's testicle and penis as he searched [his] body, he pulled plaintiff's legs in a way to seem as if he was being kinky and a dominatrix." Id. ¶ 52. Defendants argue that because they "have no idea what is meant by 'intimate dominatrix way,'" they are "unable to ascertain if plaintiff has a plausible argument" under established case law. Def.'s Mem. of Law at 16.

In Crawford v. Cuomo, the Second Circuit stated that a single incident of sexual abuse may violate the Eighth Amendment if it is "sufficiently severe or serious." Crawford, 796 F.3d at 257. The Crawford Court explained:

> [t]o show that an incident or series of incidents was serious
> enough to implicate the Constitution, an inmate need not allege

> that there was penetration, physical injury, or direct contact with uncovered genitalia. A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment. Similarly, if the situation is reversed and the officer intentionally brings his or her genitalia into contact with the inmate in order to arouse or gratify the officer's sexual desire or humiliate the inmate, a violation is self-evident because there can be no penological justification for such contact.

Id. Ultimately, in assessing whether an Eighth Amendment violation has occurred, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." Id. at 257-58 (citing Whitley v. Albers, 475 U.S. 312, 320 (1986) (determining that an Eighth Amendment inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.")).

The record is unclear whether C.O. Cruz intended to humiliate plaintiff or act for his own sexual gratification during the January 27, 2015 pat frisk. See Crawford, 796 F.3d at 257. Plaintiff does not explain how C.O. Cruz acted in a "kinky and dominatrix" way. Pl.'s Mem. of Law at ¶ 52. Plaintiff also does not proffer evidence as to whether C.O. Cruz's contact with his body was incidental to C.O. Cruz's legitimate duties, or whether he touched plaintiff to gratify himself, humiliate plaintiff, or both. Id. at 257-58. Thus, a disputed issue of fact remains as to the January 27, 2015 incident.

Plaintiff further alleges that on February 12, 2015, while escorting plaintiff to his disciplinary hearing, C.O. Cruz conducted a pat frisk in which he "pulled the back of plaintiff's

pants down[,] [caressed] plaintiff's thighs, [ ] grinded his penis against plaintiff's buttocks, groped plaintiff's penis and testicles, and then stated, 'I forgot your pussy hurts.'" Id. ¶ 58. Although C.O. Cruz's alleged February 12, 2015 conduct took place during a pat frisk, which, if properly conducted, serves a valid penological purpose, the nature of C.O. Cruz's alleged actions, combined with his sexual commentary, suggests that C.O. Cruz intended to humiliate plaintiff or act for his own sexual gratification. See Shepherd, 2017 WL 666213, at *18 ("Even if each pat frisk, if properly conducted, could have served a valid penological objective, the alleged aggressive squeezing and fondling of Plaintiff's genitalia, combined with the accompanying threats of sexual violence or retaliation, would allow a reasonable factfinder to find that the corrections officers lacked a penological purpose and intended to sexually gratify themselves, to humiliate Shepherd, or both."); Shannon v. Venettozzi, 670 F. App'x 29, 31 (2d Cir. 2016) (summary order) ("These [sexually-explicit] statements, in conjunction with Shannon's description of the forcefulness of some of the pat-downs, were sufficient to plausibly allege that Officer McTurner conducted the pat-downs either 'to gratify [his] sexual desire or to humiliate' Shannon, neither of which is a permissible motivation, rather than for any legitimate penological purpose."); Allah v. Morrison, No. 14-CV-6735, 2016 WL 4017340, at *3-4 (W.D.N.Y. July 22, 2016) ("[The defendant's] alleged taunts to [the plaintiff], including the statements, 'you know what I want' and 'give me what I want and you'll get what you want', suggest that [the defendant's] conduct was designed to humiliate [the plaintiff], gratify herself, or both."); see also Crawford, 796 F.3d at 259 ("[The defendant's] demeaning comments, including the statements '[t]hat doesn't feel like a penis to me,' [and] 'I'll run my hands up the

crack of your ass if I want to' . . . suggest that [the defendant] undertook the search in order to arouse himself, humiliate [the plaintiff], or both."). However, the record does not definitively support a conclusion that C.O. Cruz intended to humiliate plaintiff; thus, as defendants deny that this conduct occurred, a reasonable fact finder could conclude that C.O. Cruz did not intentionally touch plaintiff in a sexual manner, and that he did not intend to humiliate plaintiff and/or gratify himself. See Crawford, 796 F.3d at 257-58. Therefore, it is recommended that plaintiff's Motion for Summary Judgment be denied on this ground.

### 4. Fourteenth Amendment Due Process

Plaintiff contends that Supt. Lee denied him a "fair hearing and failed to be [a] fair and impartial" hearing officer by "purposely den[ying] [him] the right of due process . . . [because] plaintiff refus[ed] to cut his hair and filing grievances," and "subjecting plaintiff to confinement that was atypical hardship." Pl.'s Mem. of Law at 75-76. Plaintiff further contends that Capt. Webbe, DSS Russo, Lieut. Simmons, and Deputy Superintendent Wendland acted as hearing officers and "punished plaintiff for refusing to cut his hair under atypical and hardship confinement." Id. at 78. Plaintiff claims that Lieut. Sullivan violated his due process rights by finding him guilty of refusing a direct order, after finding him innocent in two earlier disciplinary hearings regarding his hairstyle. Id. at 79. Defendants argue that plaintiff fails to explain "why or how Supt. Lee was not impartial." Def.'s Mem. of Law at 17.

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall  . . .

deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1.  To set forth a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted); see Mitchell v. Keane, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege *both* that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

### a. Liberty Interest

Plaintiff reiterates the conditions of confinement claims alleged in his Eighth Amendment claim. See subsection III.B.3.a. supra.  An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-84 (1995).  "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Sandin, 515 U.S. at 484); see Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999) (quoting Sandin, 515 U.S. at 486)

("Although there is no bright-line rule regarding the length or type of sanction that would give rise to an 'atypical and significant hardship,' this standard will not be met unless the disciplinary and administrative sanctions are onerous.").  Based on the analysis set forth in Section II.E.1, the undersigned assumes for the purposes of this assessment that plaintiff's 240 days in keeplock implicates a liberty interest.

### b. Procedural Due Process

Although inmates retain their constitutional right to due process protections, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the fully panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556 (1974); see also Arce v. Walker, 139 F.3d 329, 335 (2d Cir. 1998) (holding that an inmate is entitled to minimal due process protections when being involuntary placed in administrative confinement).

> Certain due process protections therefore apply where disciplinary proceedings may lead to the loss of good time credit or would subject an inmate to solitary confinement in the SHU. Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken.

Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted).

### i. Supt. Lee

Plaintiff suggests that Supt. Lee failed to act as a fair and impartial hearing officer.  An

inmate is entitled to a fair and impartial hearing officer to preside over his or her disciplinary hearing.  See Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004).  However,  "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989).  Instead, "due process requires only that the hearing officer not be a 'hazard of arbitrary decision making.'" Espinal v. Goord, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (quoting Wolff, 418 U.S. at 571).  Due process is thereby satisfied so long as there is "some evidence" that substantiates the hearing officer's decision.  Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

Plaintiff does not allege any facts regarding Supt. Lee's disciplinary hearing, and, therefore, the undersigned is unable to determine whether Supt. Lee acted as a fair and impartial hearing officer.  Thus, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claims against Supt. Lee be denied.

### ii. DSS Russo

Insofar as plaintiff claims that DSS Russo violated his due process rights by "punish[ing] [him] for refusing to cut his hair under atypical and hardship confinement," such claim cannot stand.  Pl.'s Mem. of Law at 78.  The record does not establish that DSS Russo conducted any of plaintiff's disciplinary hearings. Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claim against DSS Russo be denied on this ground.

### iii. Capt. Webbe

Plaintiff claims that Capt. Webbe stated that "Supt. Lee sent him to hold the hearing so that he could skim plaintiff real good." Pl.'s Mem. of Law ¶ 121.  However, plaintiff does not proffer the disciplinary hearing transcripts.  Plaintiff offers a disciplinary disposition attributed to Capt. Webbe, but it is unclear if this is the hearing plaintiff refers to as he alleges Capt. Webbe's hearing commenced "on or around May 15, 2015," and the proffered disposition is dated April 9, 2015.  Pl.'s Mem. of Law ¶ 121; Dkt. No. 123-4 at 118.  Thus, the undersigned is unable to conclude whether there was "some evidence" to substantiate Capt. Webbe's disciplinary dispositions. Superintendent, Mass. Corr. Inst., 472 U.S. at 455. Thus, plaintiff has not established that there is no genuine dispute as to any material fact to warrant summary judgment.  FED. R. CIV. P. 56(a).  Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claim against Capt. Webbe be denied.

### iv. Lieut. Simmons

Plaintiff claims that Lieut. Simmons informed plaintiff that "his supervisors told him to find [plaintiff] guilty." Pl.'s Mem. of Law ¶ 72.  However, plaintiff does not proffer the disciplinary hearing transcripts.  Plaintiff offers disciplinary dispositions attributed to Lieut. Simmons, but those dispositions do not correspond with the dates plaintiff set forth in his facts section, and it is unclear whether these represent the hearings plaintiff claims violated his due process rights.   Thus, the undersigned is unable to conclude whether there was "some evidence" to substantiate Lieut. Simmons' disciplinary dispositions. Superintendent,

Mass. Corr. Inst., 472 U.S. at 455. Thus, plaintiff has not established that there is no genuine dispute as to any material fact to warrant summary judgment. Fed. R. Civ. P. 56(a). Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claim against Lieut. Simmons be denied.

### v. Lieut. Sullivan

Insofar as plaintiff contends that Lieut. Sullivan was biased because he "stated off the record that he had to [find plaintiff guilty] because his supervisors (Webbe, Lee, and Russo) told him too [sic]," Pl.'s Mem. of Law at 79, plaintiff has proffered no evidence to substantiate his claim other than his self-serving allegation. See Sloane v. Borawski, 64 F. Supp. 3d 473, 488 (W.D.N.Y. 2014) ("Plaintiff's bare, conclusory assertion that [the defendant] denied him a fair and impartial hearing is belied by the evidence in the record before this Court."); Tirino v. Local 164, Bartenders and Hotel and Restaurant Emp. Union, AFL-CIO, 282 F. Supp. 809, 817 (E.D.N.Y. 1968) ("Such conclusory statements fall far short of the requirement of Fed. R. Civ. P. 56(e) that evidentiary facts must be offered in support of a motion for summary judgment."). Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claim against Lieut. Sullivan be denied.

### vi. Deputy Superintendent Wendland

Plaintiff claims that Deputy Superintendent Wendland, as his hearing officer, incorrectly stated that plaintiff's hair was "braided and in locks," and asked improper

questions of witnesses.  Pl.'s Mem. of Law ¶¶ 79, 79-80.[38]  Plaintiff does not proffer the disciplinary hearing transcript for this hearing or provide a disciplinary disposition, and the undersigned is unable to conclude whether there was "some evidence" to substantiate Deputy Superintendent Wendland's disciplinary dispositions.  Superintendent, Mass. Corr. Inst., 472 U.S. at  455.  Moreover, there is  no  indication that Deputy Superintendent Wendland denied plaintiff the opportunity to call witnesses, Luna, 356 F.3d at 487; indeed, plaintiff's memorandum of law establishes that he did call a witness. Pl.'s Mem. of Law ¶ 79, p. 25.  Thus, plaintiff has not established that there is no genuine dispute as to any material fact to warrant summary judgment. FED. R. CIV. P. 56(a).  Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claim against Deputy Superintendent Wendland be denied.

### 5. Supervisory Liability

Plaintiff contends that Comm. Annucci and Supt. Lee "were aware . . . that the cells at Eastern [ ] had no way for inmates to receive food if they are confined . . . [and] did nothing even after plaintiff fell and injured his back."  Pl.'s Mem. of Law at 82-83.  Plaintiff further claims that Supt. Lee "did nothing after plaintiff made [him] aware that he was being punished and confined for wearing a Mohawk hairstyle."  Id. at 83.  Defendants argue that plaintiff's contentions "amount to no more than claims of respondeat superior liability," and that neither "Superintendent Lee or Commissioner Annucci were personally involved in any of the alleged

---

[38] Plaintiff's facts section contains two paragraph (¶) 79s.  See Pl.'s Mem. of Law at 24, 25.  The information cited here is taken from both ¶ 79s on pages 24 and 25 of plaintiff's memorandum of law.

constitutional claims." Def.'s Mem. of Law at 19.

Supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). In this Circuit, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (additional citations omitted)). However, supervisory personnel may be considered personally involved in their subordinate's conduct if:

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (additional citation omitted)).[39]   Absent a subordinate's underlying

---

[39] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass

constitutional violation, there can be no supervisory liability.  See Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see also Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability.").

Plaintiff seems to suggest that because Supt. Lee and Comm. Annucci "walk around [the facility] and inspect the prison," they knew of the alleged constitutional violations, and failed to remedy the wrong.  See Pl.'s Mem. of Law at 82-83.  This argument falls under the second Colon factor.  See Colon, 58 F.3d at 873.  Plaintiff does not claim that he sent a letter to either Supt. Lee or Comm. Annucci informing them of the lack of "feed-up slots" in the cells and how the failure to have a feed-up slot at ground level put him at risk of injury, nor does plaintiff contend that he verbally informed either defendant of his concerns regarding the feed-up slot.  Supt. Lee and Comm. Annucci's potential presence in the facility does not amount to actual knowledge of plaintiff's conditions of confinement and does not constitute personal involvement under the second Colon factor.  See Colon, 58 F.3d at 873.

Moreover, as to plaintiff's claim that Supt. Lee "did nothing after plaintiff made [him] aware that he was being punished and confined for wearing a Mohawk hairstyle," Pl.'s Mem. of Law at 83, the record belies his claim.  After plaintiff informed Supt. Lee of these alleged violations, Supt. Lee directed Capt. Webbe and DSS Russo to investigate his claims.  Pl.'s Mem. of Law ¶¶ 20, 24.  As it is within the purview of a superior officer to delegate

---

Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

responsibility to others, Supt. Lee's referral to subordinate officers does not suffice to demonstrate his personal involvement.  See Vega v. Artus, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007)).

Insofar as plaintiff contends that Comm. Annucci failed to train employees on how to "properly respect prisoner's constitutional rights" and failed to supervise subordinates at Eastern, plaintiff's conclusory statement, unsupported by the record, does not amount to personal involvement.  Pl.'s Mem. of Law ¶¶ 99-100.  Plaintiff may not name and attempt to hold liable these individuals merely because they hold positions of authority within the prison system without substantiating claims against them.  See Colon, 58 F.3d at 874 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain Colon's claim."); cf. Thomas v. Calero, 824 F. Supp. 2d 488, 509 (S.D.N.Y. 2011) ("We believe that, as a matter of pleading, [Director of Special Housing/Inmate Disciplinary Programs] Bezio's actions, by affirming CHO Calero's determination with only a modification of the penalty, are sufficient to demonstrate personal involvement and could lead a trier of fact to impose liability under the second Colon factor."); Rodriguez v. Selsky, No. 9:07-CV-0432 (LEK/DEP), 2010 WL 980273, *6 (N.D.N.Y. Mar. 15, 2010) ("Those cases concluding that a plaintiff's allegations that defendant [Director of Special Housing and Inmate Disciplinary Programs for DOCS] Selsky reviewed and upheld

an alleged constitutionally suspect disciplinary determination are enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consistent with the Second Circuit's position regarding personal involvement.").

Accordingly, it is recommended that plaintiff's Motion for Summary Judgment as to his supervisory liability claims against Supt. Lee and Comm. Annucci be denied.

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**RECOMMENDED**, that plaintiff's Motion for Summary Judgment (Dkt. No. 111) be **DENIED**; and it is further

**RECOMMENDED**, that defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(c) (Dkt. No. 118) be **DENIED without prejudice**, and with opportunity to renew by way of a combined motion to dismiss and motion for summary judgment limited to the issue of exhaustion or, in the alternative, by way of an exhaustion hearing, should defendants request such a hearing; and it is further,

**RECOMMENDED**, that if the District Judge adopts this Report-Recommendation and Order in full, the Clerk of the Court will return this case to the Magistrate Judge to set deadlines for this renewed motion; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[40]

Dated: February 5, 2018
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[40] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).